[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff wife commenced this action for a dissolution of the parties' marriage on the ground of irretrievable breakdown. She also sought alimony, a property settlement and other relief, as on file. The defendant husband admitted the allegations in the complaint. In the first count of his cross complaint, he also alleged the irretrievable breakdown of the marriage; in the second count, adultery of the plaintiff. He seeks a dissolution of the marriage, alimony, an equitable property settlement and other relief as on file.
The spouses were represented by counsel throughout these vigorously contested proceedings. Both parties testified and submitted financial affidavits. The husband introduced the testimony of the wife's male companion and a real estate appraiser. Numerous documentary materials were introduced, including photographs, tax returns, appraisal reports, and earnings and pension statements. The parties waived oral argument and the filing of briefs. At the close of the taking of evidence, the court continued the matter until March 20, 1996, for the filing of a statement of the defendant's pension/retirement monthly benefit and its present value and supplemental information relating to the taxability and `vesting' of his social security disability benefit.
The parties orally stipulated that the value of the jointly owned family dwelling, 1604 Glasgo Road, Voluntown, CT Page 2793 Connecticut, is $121,500, and that the outstanding mortgage balance is $38,829. From the evidence, the court finds as follows:
The parties were married at Ballouville, Connecticut, on August 16, 1986. One of them has resided continuously in this state for at least one year before the date of the complaint, February 13, 1995. There are no minor children issue of the marriage, and none were born to the wife since the date of the marriage. Neither party is a recipient of public assistance, all statutory stays have expired and this court has jurisdiction.
The wife is 36 years old and in good health. She is a high school graduate, and shortly after the marriage, she left a low paying factory job with the defendant's encouragement and support to take a one semester course in architectural drafting, in which she obtained a certificate. She became employed by Electric Boat in October, 1987, and has worked there since as a structural designer. She earns $627[1] per week gross, $437 per week net, plus some occasional overtime. She has a retirement plan, health insurance and a 401K investment plan, to which the employer contributes, available through her employment.
The defendant husband is 44 years of age, and a high school graduate with an associate's degree in mechanical engineering. He has suffered from recurring bone and brain tumors from childhood. These have required a number of surgical interventions over the years. He continues to suffer from intermittent seizures, which require him to stop whatever he is doing and rest or nap for an hour or two. He takes considerable dosages of medication daily for his health problems. He began work as a quality assurance analyst for Electric Boat in 1981, left for a while, and returned. He was then promoted to senior quality analyst, and left his EB employment on a disability in 1992. He began collecting disability payments from social security in 1993, and was subsequently laid off. He receives a total of $433 per week gross and $372 per week net in disability income from social security and his employer's disability insurance.
According to the joint 1994 federal income tax return, only $12,440[2] of his gross annual income of $22,516 is taxable for federal income tax purposes. If the same figures hold for CT Page 2794 1995, even when adding his alimony income to his taxable income, he appears to be substantially overstating his federal income tax deduction.
Despite the husband's illnesses and impairments, he has performed substantial construction work on the marital home during 1991 and 1992, and similar work on his mother's addition in 1994. He is able to drive, ambulate and see to his daily personal needs and care. He has significant occupational skills in construction and carpentry and has an earning capacity which is not being fully exploited at this time. He plans to participate in vocational rehabilitation this fall and perhaps obtain training in the computer field, which he expects will provide him with income comparable to his prior earnings. This will be arranged through the disability insurer.
The parties' marriage of almost ten years duration began to be sorely stressed by the husband's brain tumor surgery in late 1986, and its after effects. In 1989, after another surgery, he had some facial paralysis and impairment of his speech and hearing. The wife helped care for him throughout; however, she had an alcoholic problem, drinking as much as a six-pack of beer a night on weekends. The couple had few interests in common. The coup de grace to the marriage was delivered by the wife's affair which began in late 1994.
When the husband learned of it, there was a physical altercation in which she was slightly injured. As a result of the husband's ultimatum, the wife left the family home in January, 1995, to live with her male companion, with whom she now resides and shares expenses. The husband remained in the marital dwelling.
Afterward, the parties made a minimal attempt at reconciliation, which amounted to one visit to a marriage counselor. The husband sent flowers. He asked the wife to return to him. However, the parties have remained separated since the wife left the home. It is now clear that the marriage has broken down irretrievably, and after consideration of the totality of the circumstances, and the credibility of the parties, including their demeanor, attitude and conduct, I find that a larger share of the responsibility for its destruction must lie at the wife's door.
The parties disclose the following assets. A jointly CT Page 2795 owned family home, 1604 Glasgo Road, Voluntown, Connecticut, worth $121,500. It is subject to a mortgage with a present balance of $38,829, leaving net equity of $82,671. The husband has a 1990 Ford automobile worth $5,000, a boat and camper worth $800, tools worth $3,000, bank accounts of $539, Series E bonds valued at `maturity' at $2,000, and an SSIP through his employer which has a present value of $59,934. He also has a debt of $800 due him from his brother, and household furnishings valued at about $1,500.
The tools, his brother's loan, the household furnishings and the present value of his vested pension benefit, and the monthly payments[3] available to him upon retirement were not disclosed on his financial affidavit, casting doubt on his credibility.
The wife discloses a Jeep valued at $7,500, miscellaneous personal property (household furnishings) valued at $1,300, bank accounts of $2,378,[4] her SSIP of $25,094.15 and the present value of her retirement benefits, $22,000. She is vested in her plan; at this time it will provide her with $280 per month at her age 65.
The wife did not itemize her wedding and engagement rings valued at $650, which are in the husband's possession and which he has refused to return to her.
Against these assets, the wife discloses no liabilities on her financial affidavit, but the evidence revealed counsel fees due her attorney of $4,764. The husband reports $1,720, a loan against his SSIP, although he, too, has obligations for attorney's fees.[5]
Some of the increments of value in the husband's SSIP and pension plan predated the parties' marriage, however, they were not quantified. The parties' cars were purchased from joint savings. The house was built by the couple on a lot purchased by them in 1991 for $32,500, with joint savings. The parties commingled their funds by depositing one spouse's pay check into savings, and paid household expenses from the other's pay check for a number of years. In 1993 or thereabouts, after the house was completed, they reversed the scenario. The husband borrowed $16,000 from his SSIP and the parties took out a $50,000 mortgage to complete the house and garage. The husband and wife did much `hands-on' work on the CT Page 2796 house, including design, carpentry, plumbing, painting, etc., and the house was completed in 1993. The husband allocates the work the couple did as, 80 percent by him, 20 percent by her. The wife, 70 percent by him, 30 percent by her.
The wife did the lion's share of the homemaking, including cooking, cleaning, laundry, shopping, etc. The husband concedes she did 60 percent of that work and claims he did 40 percent.
The following additional findings are made.
During the past four years, the wife's earnings were substantially greater than the husband's income from all sources according to the parties' tax returns and income records. Hence, even when deductions for taxes are factored in, I conclude that the wife's monetary contributions to the marriage for the years 1992-1994, inclusive, were greater than those of the husband. There is insufficient evidence of their earnings to draw any conclusions as to their relative incomes for prior years.
Their overall nonmonetary contributions to the marriage were comparable.
The parties engaged in a number of spiteful, `tit-for-tat' acts toward each other, despite the presence in the case of highly experienced and capable counsel, which added heat, but not illumination to the issues, and were decidedly financially self destructive. It is unnecessary to discuss this petty behavior in any further detail.
The husband pays $60 per week child support for his child from a prior nonmarital relationship. The child will be 18 in April, 1999. On three occasions he was in arrears, causing joint income tax refunds of almost $3,100 in the aggregate to be intercepted.
The husband removed approximately $9,300 in joint funds from the couple's joint bank accounts, of which he used $1,400 for real estate taxes due on the marital home. The wife received about $900. The balance was used by the husband for attorney's fees, other personal expenses and the $800 loan to his brother. CT Page 2797
The husband received about $7,000 from his mother contemporaneously with his work on her addition. He characterizes it as a gift; the wife as `under the table' income. No accounting or evidence was provided as to the use of this money. The mother gave him gifts of $600 in 1995.
The parties lived together for about four years prior to the marriage.
The husband has possession of the major portion of the furnishings, furniture and tangible personal property. The parties enjoyed a modest life style and did not travel extensively or go on expensive vacations.
There is an alimony arrearage of $900 due the husband from the wife as a result of a retroactive pendente lite order of periodic alimony.
The husband has a fully paid insurance policy with a face value of $1,000. Its cash value was not disclosed on his financial affidavit.
The court has considered all of the criteria in General Statutes §§ 46b-62, 46b-81 and 46b-82 in the light of the evidence and findings in the determination of the financial orders set forth below. I have also considered the taxable consequences and implications of said orders.
Accordingly, judgment may enter dissolving the marriage on the ground of irretrievable breakdown.
(1) All right, title and interest in and to the following property is hereby vested in and assigned to the husband: the marital dwelling at 1604 Glasgo Road, Voluntown, Connecticut, subject to the mortgage thereon which he shall pay and save the wife harmless therefrom (and excepting the portion set out to the wife in paragraph 2 below), and all the personal property therein, except the property described in paragraph 2 below; the 1990 Ford automobile, the boat and camper, his bank accounts, the Series E bonds, the life insurance policy received from his grandfather, and his SSIP and retirement plans.
(2) The wife shall take and have the following property, which is hereby assigned to her: her 1989 Jeep, the CT Page 2798 tangible personal property now in her possession, her bank accounts, the $1,678 escrow fund, her SSIP and retirement plans and the following items described on Exhibits 2 and 2A: the smoker/grill; food dehydrator; blender-food processor; salad spinner; fiesta ware china; wooden salad bowl set and tongs; blue-stemmed wine glasses; pizza stone; double wall cookie sheets; French white chip and dip set. She shall also have her engagement and wedding rings.
The husband shall execute and deliver to the wife a promissory note in the amount of $45,000 with simple interest accruing at the rate of 4 percent per annum secured by a second mortgage on the Glasgo Road premises. The principal balance of said note and mortgage together with accrued interest shall be payable on the first to occur of the following events: the death, remarriage or cohabitation of the husband, the sale or transfer of the premises, his ceasing to reside there as his principal residence, or April 1, 2001. Said note and mortgage shall contain default provisions typically prevalent in residential mortgagee used by lending institutions in New London County; a thirty day grace period; and, for acceleration in the event of default. It shall also provide for interest to commence to accrue on the unpaid balance at the rate of 8 percent per annum in the event of default until payment, and for attorney's fees and costs of collection. The wife shall be named mortgagee/loss payee on the homeowner's insurance policy, and, a failure by the husband to maintain the first mortgage and real estate taxes current shall be deemed to be a default.
(3) The wife shall pay to the husband the sum of $50 per week periodic alimony for a period of 30 months, which shall be nonmodifiable as to term or amount and shall terminate upon the death of either party, or the husband's remarriage or cohabitation. Said sum shall be secured by immediate wage garnishment.
(4) The wife shall irrevocably designate the husband as beneficiary of her $10,000 Aetna policy so long as she is obligated to pay alimony hereunder. She shall execute an authorization to him so that he may, from time to time, determine the status of said policy.
(5) The husband shall do likewise with his EB policy in the amount of $31,500 and name the wife irrevocable beneficiary thereof so long as there is an outstanding balance CT Page 2799 due on her mortgage, and execute an authorization to wife as in paragraph (4) above.
(6) The husband shall pay the debts shown on his financial affidavit.
(7) Each party shall pay his or her own attorney's fees; each party shall be entitled to declare one half of the mortgage interest and real estate taxes on the family dwelling for the tax year 1995.
(8) All documents incidental or necessary to the effectuation of these orders shall be completed and exchanged within thirty (30) days hereof.
(9) The tangible personal property set out to the wife shall be transferred within thirty (30) days. In the event it', is not so done, the husband shall pay the wife the sum of $1,250 within ten (10) days thereafter.
(10) Upon the transfer of the personal property to the wife, as referred to in paragraph 2 above, the wife shall pay to the husband the arrearage due of $900, less any credits for payments made toward said arrearage after March 7, 1996.
(11) The defendant's request for an order respecting dental insurance is denied.
Teller, J.